Good afternoon, Your Honors. My name is Jim Lovesense. I represent Isabelle Bichindaritz. I'd like to reserve five minutes. With me at council table is my co-counsel Lucy Luke. I'd like to start by summarizing what I think are the five legal errors that the District Court made in analyzing this case. To begin with, I think the District Court used a standard that no one has ever used to refuse to consider comparator evidence. Well, counsel, I want to ask you about that. It appears to me that the court did consider comparator evidence and just didn't find it particularly useful. Well, I can understand why you would ask me that, Your Honor. I know that the court used the word marginally relevant, but if you read further into that part of the excerpts of record, I think the District Court essentially says, I'm not going to read it, and that marginally relevant is an explanation of why I'm not going to read it. That also flows from what the judge said when, well, I think he said, I'm not going to give a tired eye review to these files because this is not a single motive case. And I'm only going to do that if it's a single motive case. Well, I know there's a reference there, counsel, but it appears also, though, and I'm trying to figure out whether or not he properly used the comparator evidence or not, but it does appear at ER 38 Note 2 that the court explicitly compared Ms. Bishendarts to Dr. Chung and it seems to acknowledge that the comparator evidence was relevant to the issue of discrimination but was nonetheless not persuasive. I think that's at Note 3 at ER 41. I guess I wanted to see how do you reconcile or how do you make sense of those two portions of the District Court's decision if your argument is that the District Court refused to consider the comparative evidence? I think I would say two things, Your Honor. To the extent that the District Court said, almost he pointed to evidence that was almost like Henry Higgins' comment why can't a woman be more like a man? I mean, there was evidence in the record that Chung and Chin were easy to get along with guys. I do think the District Court was aware of that evidence and pointed it out, as you've said. But I do not think that he looked at the comparative evidence of the teaching or of the scholarship and you would think that if he had looked at it, he would have made... She. Oh, no. That was Judge Lasnik. It's the other case that was Judge Peckman. Sorry? I would think that if he had looked at their comparative teaching records or if he had looked at their comparative scholarship records, he would have made some finding about it. He made none. Well, he made a finding about the teaching specifically. That's what footnote 2 is about. And his comment specifically was something along the lines was Dr. Chung when criticized for being a deficient teacher, took it very seriously and worked to overcome the problem, whereas your client did not. So that isn't about being a nice guy. That's about taking the criticism of teaching deficiency seriously. Well, that's true, Your Honor. Although I don't know that you can really see that as an examination of are they really different in their teaching abilities. Well, she did receive your client did receive quite significantly low assessments from students about her teaching. I think the record is clear that her teaching record and Professor Chung's teaching record are essentially the same type of evaluations from the students. What's different is that affective way that they respond. She didn't... He made a finding that she didn't accept it with the grace that Professor Chung accepted it with. Well, it's not just grace under fire. He apparently took concrete steps to meet with someone and try to increase teaching effectiveness and did things to try to improve that the court found that your client didn't. Yes, but at the end of the day, I think the only at best, their teaching confidence is equal. There's some evidence in the record that one person on the faculty went on at length about how really she's better because Professor Chung really set back our program quite a ways with his teaching and she has much better long-term potential. With respect to scholarship, with respect to which I don't think he made any finding at all ever or even a straight comment, everyone agrees that her scholarship is better than anyone's in the department at all. I don't think that was my memory is at least that that was not the main issue that was involved at tenure. I don't think there was a serious question about her scholarship, which everyone agrees is excellent. I do want to point out, though, that the district court cited this Third Circuit case about deference and giving deference to academia as a justification for why he was not going to give what he was, and this court in Lynn versus Regents of the University really used exactly the opposite result of the Third Circuit and explicitly explained why comparator evidence is actually a good thing because it enables judges to avoid intruding into academic things. I think everyone would probably agree that courts are less skilled at figuring out whether somebody's scholarship in some highly complex field is good or not, but when you use comparator evidence, you use the university's own yardstick. You're not substituting your judgment for theirs. You're taking their judgment. Their judgment was that Professor Chung, the male, and Professor Beshinderitz, the female, had basically the same teaching performance. They also relied on this collegiality, which everybody knows can be, this court has said, can easily be a pretext for sex discrimination, and the district court, this is another error he committed, never understood the significance of not following your own policy. We have never said... Let me try to clarify your position. Is it your position that collegiality is not a valid concern or just that it is applied in an unequal manner? A little of both. I will say, Title VII does not preclude any employer from considering collegiality. It happens that on the facts of this case, by contract, the University of Washington does. The university prohibits it totally, and I think the reason is clear why they do, because they realize it can be a smokescreen for sex discrimination. So in your view, the University of Washington is obliged to give tenure to someone who everyone would agree, I'm not saying this is your client, but who everyone would agree is completely obnoxious and mean to their colleagues? I think you phrased it too strongly, more strongly than I have. They're not obliged to give tenure to somebody who's a complete jerk, but they are obliged to not consider their jerkiness. They are supposed to look at service, scholarship, and teaching. Right, so if they're good in the... Just a minute, just because, we'll say that and it seems to me this is the case, that collegiality was given great weight, and you've pointed to evidence that indicates that within that system it shouldn't be considered. Maybe that's a violation of university policy, but doesn't mean it's a violation of Title VII. That's correct. I'm not saying that it is, per se, a violation of Title VII. All I am saying is that as Reeves v. Sanderson points out, when you violate your own policy, it gives rise to permissible inference. You don't have to draw the line. Alright, but this was after a trial and the district court made a finding. The district court said repeatedly, this is of zero relevance to me, that they violated their own policy, and in fact, by the end of the case, he doesn't even have the facts right anymore. At the end of the case, he lectures in his memorandum decision, he lectures Professor Bischendritz by saying, and you didn't even acknowledge that collegiality is a permissible factor, when the district court is dead flat wrong. In fact, Bischendritz is right. It's not a permissible factor, and the district court judge just doesn't understand that at all. I'm not sure, you're saying collegiality is not a permissible factor for what, I just want to make sure I understand what you're talking about. Under the contract terms of the University of Washington, collegiality is absolutely out of bounds, you may not consider it, and by the end of the case, he's lecturing her for not understanding, he says, you're stubborn, you're unwilling to acknowledge that this is a proper consideration, when it's not. She's right. And because he doesn't understand the significance of the inference that can be drawn from not following your own policy, he doesn't analyze it at all. He never addresses whether or not there is a pretext here, and I do want to touch on another reason why, he never mentions the word pretext in his decision, ever. This court said in Norris v. City of San Francisco, but findings have to be adequately detailed in order for you to review it and see, and in this case, there are no findings whatsoever about pretext, because he says this is a single motive case, and I don't have to look at this stuff, which is inconsistent with the statute. The statute that sets up, that makes sex discrimination illegal, specifically says that if sex is a motivating factor, even if there are 57 others, it's an unlawful employment practice if it's a motivating factor, even though other factors also motivated the practice, so it doesn't matter. I think you would have to find at the very least that he doesn't make adequate findings, because he doesn't make any findings about pretext whatsoever. I haven't had time to touch on the evidence rule 615 error, but I think that's clearly error. The judge didn't exclude somebody, he inserted a word into the rule that isn't there, he can't do that. What prejudice is there from that alleged rule violation? I think there was prejudice because Dr. Rushing was able to tailor her testimony to the testimony of Professor Baiocchi, but I would really want to stop and pause that it is not my burden to prove prejudice. Under this circuit's precedent, it is the university's burden to show that it's not my... From any rule violation? No, from rule 615 violations only. In Sashilly and El, this court held that the burden is on them to prove that tailoring couldn't have happened and couldn't really have influenced what went on here. In this case, Baiocchi and Rushing were the most important witnesses there were, and Rushing followed Baiocchi, and when she followed Professor Baiocchi, somewhere in her testimony she said and I got to hear what Professor Baiocchi said and the district court said, because I let you, because I let you stay. And it was very critical testimony that the two of them gave on certain points which she was able to tailor. I'll save my remaining time. You may do that, thank you. Good afternoon, may it please the court. Howard Goodfriend, representing the Apelli University of Washington, defendant below. With me at council table is trial counsel Seth Bernson. As Judge Tashima pointed out, this is not a summary judgment case. This is not a dismissal for failure to establish a prima facie case. This is not a contract case. This is a factual challenge to the district court's findings entered after a six day bench trial. This is not a case where the district court didn't look at the evidence. Judge Lasnek heard from two dozen witnesses. He considered hundreds of exhibits. He admitted the string site of the evidence of comparators on page 51 of our brief is four lines. And he decided the ultimate issue. And that was that of intentional discrimination. And he found that Dr. Bichinderitz's gender played no role whatsoever in the denial of tenure. That the university's reliance on her lack of collegiality was not a pretext. And no, he did not use the word pretext. But he did expressly find that the importance of teaching excellence and collegiality in the tenure and promotion process were not post hoc litigation justifications for the rejection of plaintiff's application. You agree with your opponent's position that it's the policy of the University of Washington that collegiality cannot be considered in tenure decisions? No, I do not agree with that, Judge Tashima. What the university handbook and faculty code state is that it may consider a candidate's fit in an application for tenure. And certainly fit can include collegiality. And it certainly can consider the effect of collegiality on teaching and on service. And it did that here. Judge Lasnik found that it did so here. He found that the importance not only of teaching excellence and collegiality were not post hoc litigation justifications but that there was substantial and if not, certainly there was enough evidence to get beyond summary judgment. There could have been a finding, perhaps I'm not going to concede that, but it did go to the trier of fact and he considered whether the University of Washington was using collegiality as a pretext for unlawful gender discrimination. And what he found, as did those who rejected her tenure application, was that it adversely affected both her teaching and her service to the Institute of Technology and the Tacoma campus. The evidence is substantial. Her previous director, Dr. Crum, said that her contentious and conflict-ridden relationships were impairing her ability to obtain tenure long before Dr. Biocchi entered the scene. She resented encroachments on her turf. She complained about her schedule. She rejected peer reviews of her teaching and refused to meet and discuss the academic year. She criticized virtually every negative critique of her teaching and considered examples were when a negative evaluation occurred, you evaluated me for a calendar year instead of an academic year. You didn't give me notice before observing my classes. Her teaching did not approve and the reason it was deferred a year because the provost, Dr. Wise, decided that we are going to give her a year to determine whether she is serious about improving her teaching. She didn't. Let me ask you about the statement from the district court that we spent some time on with your opponent. And that is when the district court said he declined the plaintiff's invitation to engage in the high scrutiny of the files of successful male candidates for tenure in an effort to second guess the numerous scholars at the University of Washington. Does this mean I'd like to know your position of what this means with respect to the district court fairly evaluating the comparative evidence. I'm happy to answer that. Title VII doesn't require that every candidate with similar qualifications be treated similarly. It doesn't require that every objective measure of a candidate's qualifications be weighed and that the person with the best scholarship reviews get a job. It instead prohibits denying a candidate advancement based upon gender in this particular case. Tenure is a lifetime academic appointment. The reference I think to the refusal to engage in a tired eye comparison is simply a reflection as the district court expressly says in that footnote three. A decision whether to grant tenure rests on a complex multi-tiered nuanced analysis of the candidate conducted by individuals with far greater familiarity with both the university and the area of study. Yes, you do have to take into account a subjective evaluation and you have to look at it closely. You have to look at whether collegiality is being used as a pretext. The district court did that here and he found that it did not. Judge Friendly's quotation, I think it's the second circuit from Judge Friendly's decision in Lieberman, is simply a recognition that you don't use a checklist to determine whether someone violated Title VII. Can you respond to Dr. Chung and whether or not he was fairly compared or not? The district court did compare him and he did make a finding and the record supports that finding that when Dr. Chung's brought up as an issue, and it was an issue, he took those criticisms to heart and he reached out to his college and he made a dedicated effort to improve his teaching. And the provost testified to this as well because she ultimately made the decision to grant Dr. Chung tenure and deny it to Dr. Buchendris. That was a significant distinction and to the extent there's evidence to support that distinction, the district court's findings are not clearly erroneous. I'm going to switch. What about Dr. Biaggi's letter? There's been a lot of discussion about it during the trial and also in some of the briefing and whether it was personal and distasteful. What role should Dr. Biaggi's letter that he sent have here? Well, he sent two letters. He never supported Dr. Buchendris. That's undisputed. What the district court found, though, was that the basis for Dr. Biaggi's animosity towards her was not gender based. It was not the product of illegal discriminatory animus. It was the function of longstanding tensions resulting from the difficulties that Dr. Biaggi and his frustration in getting her to engage in the department and the institute and to accept constructive criticism about her teaching. Did the district court make any finding on how important Dr. Biaggi's recommendation was to the ultimate tenure decision? Yes, Judge Tichini made express findings to that effect. What he found was that it had no effect whatsoever. He cited Staub, the controlling Supreme Court authority, and he basically said that even had Dr. Biaggi approved her application in 2009, Dr. Wise, the provost who was ultimately responsible for the tenure decision, would have rejected it because as she testified there was a split here. There were some people in favor of her. There were some people opposed to her. The department itself split for three and even her supporters, as the district court found, harbored serious reservations about both her teaching, her service, and her effect on the department's ability to effectively operate and collaborate. There is an alternative basis to affirm, and that is that as a matter of law and fact, there was no proximate cause with respect to Dr. Biaggi's letter, even if it had been the product of sexist animus. I have a question about the Rule 615 argument. I want you to assume, for the purpose of this question, that a former employee of an entity is not eligible to be seated at council table and that Dr. Rushing was not essential, which is an alternative argument you've made. We review such an error for harmlessness. Why would this error be harmless in your view? Well, again, this was a case where there were two dozen witnesses, 25 to be exact, were called. Dr. Rushing was the third witness called by the plaintiff on the first day of trial. This is not a case in which you have, like the criminal cases being cited by Dr. Bichinderitz, two agents talking about a search or a vehicle stop. This is not a case in which the district court's findings turned upon the credibility of Dr. Rushing. What Dr. Bichinderitz did was elaborate 100% by her written record as she went along. She did not vouch for Dr. Biachi. She talked about her decision, why she initially supported and then opposed Dr. Bichinderitz's tenure application. There's no question that she in any way lent credence to Dr. Biachi's testimony. In fact, she testified that she had lost confidence in Dr. Biachi by the time she made the decision and subsequently removed him because he wasn't an effective leader of the Institute. So to try to summarize if I understand your position, it is that because her testimony came early and was corroborated, it would not have, more probably than not, had an effect on the verdict. It absolutely had no there's no reasonable person reviewing this record could come to the conclusion that by being in the courtroom during Dr. Biachi's testimony, she modified her testimony in any way or that the ability of her to sit and observe Dr. Biachi's testimony had any effect whatsoever on the district court's judgment, which in the end rested upon Dr. Wise's ultimate decision and she wasn't there. I have another question which may come across as being somewhat off the wall. As I was reading this case, it struck me that it sounds almost like a cultural clash of sort of how European academia works and how  to be more territorial, more that some of the things that are asked of an American professor may be offensive to a European professor because that's not how things work. And I don't know if that's a correct perception, but has there ever been a claim in this case of national origin discrimination or anything of that sort? There was an initial in the agency level there was an allegation of gender discrimination and it was not pursued. You mean national origin? National origin discrimination. It was not pursued. It was abandoned. The district court, I think in some of the subsequent orders expressly addresses that. Didn't the plaintiff try to dismiss this case to pursue a national origin weeks before trial? Yes, and the district court said it's way too late and that order is also unappealed. There's been no challenge to that. So this is a factual case. The findings are not clearly erroneous. Judge Lasnik's memorandum decision thoroughly and comprehensively and correctly addresses the law of Title VII and in reviewing his findings, we're asking the court to affirm them because they're supported by abundant evidence in the record and they're not clearly erroneous. If there are no further questions, I'll cede the rest of my time. You may do that. Thank you. Thank you. Judge Tishina, you asked counsel if the university would agree that collegiality is not permissible and he answered you he wouldn't agree with that because he answered that the university is allowed to consider the degree of fit. I point out to you that not only is there no support in the record for that, but what you have in the record, excerpts of record on page 181 and 182, is the Senate adjudication panel explicitly rejecting that argument. At the bottom of page 181, they say the VCAA, which is Dr. Rushing, based her emphasis on the petitioner's lack of collegiality by reading the first footnote to faculty code, blah, blah, blah, fit language. The panel does not agree with that reading of the footnote. The university rejected that reading of the footnote. They could have appealed that ruling of the adjudication panel to the president of the university. They did not. They have asked you to take judicial notice of things that happened after the trial, but in fact, in the record, is the significant point that when they tried after the second adjudication panel ruling to appeal, they tried to get the university president to reconsider that ruling that you may not consider fit and the university president refused. The record only establishes, only, that you may not consider that. You also asked counsel about causation and who affected what, and he answered you that the district court cited Staub v. Proctor Hospital, which is correct. He cited it, but if you read the way he used it, he got it exactly backwards. It's as if he just completely does not understand. He says, the provost is an independent actor who came along and made, she's the ultimate decision maker, she made her own decision. Staub exactly rejects the argument, which was everything. Staub says an independent judgment made by the ultimate decision maker and an independent investigation by the ultimate decision maker, which didn't happen here, neither of those breaks the chain of causation. I did want to go back to the Norris case for a moment and tell you something about the facts of that case. It's a race discrimination case. The reasons that were given for not promoting the African American man in that case kept changing. There was, in that case, a district court explicit finding. I do not find pretext, he said. This court reversed, vacated, and sent it back, saying that's not specific enough. You have to specifically address pretext with regard to each and every one of the explanations that the employer gave in that case. You didn't do it. Vacated and sent back. In this case, there's not a word said about pretext anywhere. If I have a little time left, it's that ruling three times this court has found that a finding of no pretext by a district court judge in a bench trial was clearly erroneous. You've done that in Thorn, Yee, and Wrighton. I think you should do it in this case as well, but at the very least, with all these mistakes here, you should remand and send it back. You could avoid any of these issues by solely deciding the case on the 615 issue. The 615 issue is a very serious issue. There were 25 witnesses, granted, but the first and third ones were Bioki and Rushing, and they are the two most important. There was a very significant possibility that she tailored her testimony to his when  she told you to hire an outside third party to do an independent investigation of whether Dr. Bioki is a sexist. You didn't do it. Thank you, counsel. We appreciate the helpful arguments of both counsel. The case just argued is submitted.
judges: Tashima, Graber, Murguia